Opinion
 

 SIMS, J.
 

 In this products liability action involving a household cleanser, we hold that product label warnings are relevant in determining whether a product has a design defect under the risk/benefit test.
 

 A jury returned a defense verdict finding no liability on the part of defendant Sunnyside Products, Inc. The trial court granted plaintiffs Carole and Norman Hansen a partial judgment notwithstanding the verdict (JNOV) (on the issues of liability and comparative fault) and ordered a new trial limited to the issue of damages. The court alternatively granted plaintiffs’ motion for a new trial.
 

 On appeal, defendant contends among other things that JNOV was erroneous due to the existence of conflicting evidence. In the published portion of this opinion, we explain why we agree and shall reverse the trial court’s orders granting JNOV and a limited new trial on the issue of damages. With respect to the trial court’s alternative grant of a new trial, in an unpublished portion of the opinion, we shall affirm. We shall therefore remand the case for a new trial on all issues.
 

 Facts and Procedural Background
 

 Although defendant’s appeal relates mainly to the products liability theory of “design defect” under a “risk/benefit test” (where a risk of danger inherent in the design outweighs the benefits of the design), plaintiffs’ case presented
 
 *1502
 
 to the jury three theories of products liability under California law—(1) design defect under the “consumer expectations” test (that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner), (2) design defect under the risk/benefit test, and (3) failure to give adequate warning of a known or knowable substantial danger.
 

 On August 24, 1991, plaintiff Carole Hansen was cleaning the bathrooms in her home with Sunny Brite water stain remover, which she had purchased in a supermarket. Defendant is the supplier of Sunny Brite.
 

 At the time in question, Sunny Brite contained a 6 percent solution of hydrofluoric acid. The label on the Sunny Brite bottle stated in part, in capital letters:
 

 “Danger. May Be Fatal or Cause Permanent Damage, Vapor Harmful, Causes Severe Burns Which May Not Be Immediately Painful or Visible. Read Carefully All Cautions on Back Panel. Keep Out of Reach of Children.”
 

 The back panel included the following cautions: “Danger. Contains hydrofluoric acid. Use only with rubber gloves, avoid contact with skin. Do not taste, swallow or breathe. Rinse empty container thoroughly with water before discarding.” The label also contained a “first aid” section, which warned that if the liquid came into contact with skin: “Immediately remove contaminated clothing. Flush skin with water for 15 minutes. Be very careful to clean under fingernails.” The label continued: “Eyes - Rinse immediately with water. Remove contact lenses, if any, then flush eyes with water for another 10 to 15 minutes.” The label continued: “Swallowed - Rinse mouth. Drink a glass of water or milk. Do not cause vomiting.” The label then directed: “Get immediate medical care. Call your Poison Center, emergency department or a physician. Specific antidotal treatment may be needed.”
 

 Mrs. Hansen wore latex gloves and a face mask while using Sunny Brite. She noticed her hand was becoming wet but assumed it was from perspiration and did not check to see if there was a hole in the glove. When she took off a glove to make a telephone call, she noticed one of her fingers was gray and shriveled. She felt no pain or discomfort at the time and believed the color change was a circulation problem. Mrs. Hansen continued using the product and subsequently began to feel pain in her hand. She placed her hand in water and complained to her husband. Mr. Hansen discovered a hole in the glove Mrs. Hansen had been using, read the Sunny Brite label, called the poison control center, and took Mrs. Hansen to the emergency room.
 
 *1503
 
 Mrs. Hansen allegedly suffered a serious and disabling injury (a point disputed by defendant and not reached by the jury in its special verdict).
 

 In August 1992, plaintiffs filed this lawsuit alleging products liability and loss of consortium.
 

 At trial, plaintiffs presented various theories of product liability—(1) design defect under the consumer expectation test, (2) design defect under the risk/benefit test, and (3) failure to warn.
 

 Plaintiffs’ expert chemist, Dr. Wilk, testified hydrofluoric acid is dangerous. Though his work generally involved laboratory settings with 50 percent solutions of the acid, he believed it is too dangerous to use in any amount in any consumer product, regardless of whether warnings were placed on the label, and in any event adequate warnings would not fit on the bottle. He testified Sunny Brite contained a 6.7 percent solution which was hazardous and “extremely insidious” because the person who is exposed to it may not realize he or she has been exposed until several hours after the exposure. In dilute solutions such as this, the acid can migrate through the skin without causing any sensation and cause damage to the underlying tissue.
 
 [1]
 

 The defense presented testimony that various household products are sold on the consumer market which contain hydrofluoric acid, such as wire wheel cleaners, ceramic tile cleaner, rust removers, etc.
 
 [2]
 
 The jury also learned the Consumer Products Safety Commission has a labeling guide for consumer
 
 *1504
 
 products containing hydrofluoric acid, and defendant’s label was consistent with this
 
 [3]
 

 Evidence adduced at trial showed that in 1993, defendant changed the formula of Sunny Brite, removing the hydrofluoric acid and substituting ammonium bifluoride. The change was made at the urging of a new employee who told defendant the new formula would be safer and cheaper to make and transport. The employee also told defendant the Environmental Protection Agency was trying to get rid of acids in consumer products.
 

 The new product (marketed under an “Improved” label) is now cheaper to make and has less safety concerns regarding transportation and storage. It still removes water stains but takes twice as long to work on a surface (30 seconds instead of 15 seconds).
 

 Evidence was also adduced at trial that in the 30 years that the product with hydrofluoric acid was on the market, defendant received only one other claim of injury in addition to plaintiffs’.
 

 In closing argument, defense counsel argued to the jurors that in determining whether there was a design defect under the risk/benefit test (inquiring whether the risk of harm outweighed the benefits of the product), they could consider the warning label as part of the product.
 
 [4]
 
 Thus, counsel argued: “You can’t separate the product from the warning. The labeling—the warnings on the product—on this product, on any product, are an integral part of the design of the product. And we’re talking in this case about design defect. And the plaintiffs in this case would have you believe that you can separate the warning and . . . Dr. Wilk, in fact . . . has testified that you can separate the warning from the product. And you can’t.” Later in his argument, defense counsel said Dr. Wilk’s view would remove from the shelves a number of consumer products containing hydrofluoric acid and: “[Dr. Wilk’s] up here, in the halls of academia, in the laboratories, hypothetically talking about, Oh, this is . . . dangerous. It is. But the question is, Is it defectively dangerous? And that incorporates, again, getting back to the
 
 *1505
 
 warning. If used pursuant to the instructions, ... do the advantages of the product. . . outweigh the risks?”
 

 Plaintiffs did not object that defense counsel was misstating the law, nor did they request that counsel’s comments be stricken or that further jury instructions be given. Instead, plaintiffs’ counsel in his final closing argument merely said: “Now, I want to go through just directly here these . . . fallacies that were raised. Somehow the—our evidence suggests that you can or we’re asking you to separate the product from the warning. On the contrary, not at all. Not at all. [U The law separates the warning out as a separate issue of the three different ways products can be found defective. But the fact is, as Dr. Wilk testified, the warning can’t replace the dangers and the safety necessary to handle this product and there’s been—there was plenty of evidence of that.”
 

 The jury was then instructed on three theories of products liability: (1) design defect under the consumer expectation test (that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner); (2) design defect under the risk/benefit test (that there was a risk of danger inherent in the design which outweighed the benefits of the design); and (3) failure to give adequate warning of a substantial danger.
 

 As pertinent, the jury was instructed as follows:
 

 “Plaintiff has the burden of proving by a preponderance of the evidence all of the facts necessary to establish:
 

 “1. Defendant’s status as a supplier of the product;
 

 “2. That defendant’s product was defective, in that:
 

 “a) the product failed to perform as safely as an ordinary consumer would expect, or
 

 “b) a defect in . . . design existed when the product left the defendant’s possession, or
 

 “c) defendant failed to give adequate warning of the danger associated with the product.
 

 “3. That a defect in the product was a cause of injury to plaintiff Carole Hansen;
 

 
 *1506
 
 “4. The nature and amount of damages.
 

 “Defendant has the burden of proving by a preponderance of the evidence all of the facts necessary to establish:
 

 “1. That the benefits of the product as a whole outweigh the danger inherent in such design.
 

 “2. That the plaintiff, Carole Hansen, was negligent; [and]
 

 “3. That the negligence of Carole Hansen was a cause of her injuries. . . .”
 

 The jury was also instructed:
 

 “Plaintiff Carole Hansen seeks to recover damages based upon a claim of a defective product.
 

 “A product may be defective because of a defect in design or ... a failure to adequately warn the consumer of a hazard involved in the foreseeable use of the product.”
 

 The jury was instructed on design defect as follows:
 

 “The essential elements of a claim based upon an alleged design defect are:
 

 “1. The defendant was the supplier of a product, namely Sunny Brite Water Stain Remover;
 

 “2. The product possessed a defect in its design;
 

 “3. The defect in design existed at the time it left the defendant’s possession;
 

 “4. The defect in design was a cause of injury [to] the plaintiffs; [and]
 

 “5. Plaintiff’s injury resulted from a use of the product that was reasonably foreseeable by the defendant.
 

 “Under the law, a product is defective in design;
 

 “if it fails to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or
 
 *1507
 
 “if there is a risk of danger inherent in the design which outweighs the benefits of that design.”
 

 With respect to design defect under the risk/benefit test, the jury was instructed: “In determining whether the benefits of the design outweigh such risks, you may consider, among other things, the . . . gravity of the danger posed by the design, the likelihood that such danger would cause damage, the mechanical feasibility of a safer alternative design at the time of manufacture, the financial cost of an improved design, and the adverse consequences to the product and the consumer that would result from ... an alternate design.”
 

 The jury was also instructed on the theory of liability for failure to warn.
 
 [5]
 

 The jury returned a special verdict, which stated in part:
 

 “We, the jury in the above entitled action, find the following Special Verdict on the questions submitted to us:
 

 
 *1508
 
 “Question No. 1: Was there a defect in design or a failure to warn defect of the product involved as to the defendant? . . .
 

 “Answer: ... No ... .”
 

 The verdict form told the jurors that if the answer to this first question was no, they were to sign and return the verdict and not answer the other questions. The jury complied. Judgment was entered in favor of defendant.
 

 Plaintiffs filed a motion for a new trial, on the grounds of (1) inadequate damages, and (2) insufficiency of the evidence to justify the verdict, or the verdict was against the law. In addition to setting forth the evidence which plaintiffs believed supported the motion, they argued inter alia that defense counsel impermissibly suggested to the jurors they could consider warnings in determining design defect, “contrary to the law upon which the jury was instructed.” In their memorandum of points and authorities, plaintiffs also noted the trial court could grant JNOV on its own motion.
 

 A hearing was held in the trial court. The major point of contention was whether warnings on a product label may be considered in determining whether there is a design defect under the risk/benefit test. Protracted argument in the trial court continued over the course of two days. The court expressed agreement with defendant’s position but took the matter under submission.
 

 In September 1995, the trial court issued a “Ruling on Plaintiffs’ Motion for New Trial and for Judgment Notwithstanding the Verdict.” The ruling stated in part: “This case has caused me much concern. Following the presentation of evidence but before oral argument, I was convinced that the uncontradicted evidence clearly and convincingly established that the product . . . was defectively designed .... The evidence was so overwhelming, I expected the plaintiffs to make a motion for a directed verdict. During oral argument, defense counsel argued that in determining whether a product was defectively designed, the jury could not separate the product from the warning on the label of the product. When counsel so stated, I expected plaintiffs’ counsel to object that defense counsel had mis[s]tated the law. When he failed to object, I began to wonder if I was mistaken as to the law. Defense counsel’s argument was clever, innovative, and compelling. It was so compelling that even dining oral argument on this motion for new trial, I was of the belief that he was probably correct. . . .” The court went on, however, to conclude based on its own review of California law, that warnings are not to be considered as part of the product in determining design defect under the risk/benefit test.
 

 
 *1509
 
 The court set forth the evidence and granted JNOV on the issue of liability, determining product warnings could not be considered in determining design defect under the risk/benefit test, and therefore the product in this case had a design defect. The court further ruled that, even if warnings could be considered, the court still believed there was a design defect under the risk benefit test, because no warning could adequately warn against the dangers inherent in this product, and the warnings on this product were inadequate in that they failed to warn of the insidious nature of the product. The trial court was also swayed by evidence of the new, safer formula, stating the new acid-free formula “do[es] the same job" without the risk of the hydrofluoric acid. The court further stated (incorrectly) that defense counsel’s contention that the new product is less effective because it takes 15 seconds longer to work was contradicted by his own client’s testimony.
 

 Additionally, though not requested by plaintiffs, the trial court went further and granted plaintiffs JNOV on the issue of the absence of comparative fault. The trial court ordered a new trial limited to the issue of damages.
 

 The court further indicated it was granting in the alternative plaintiffs’ motion for a new trial because “the court finds that there was insufficient evidence to justify the verdict and that the verdict was against the law as it was clearly contrary to the instructions given by the court.”
 

 The court noted it was aware different standards exist for granting JNOV and granting a new trial.
 

 Defendant filed a notice of appeal from the orders granting JNOV and a new trial.
 

 Discussion
 

 I.
 
 Standard of Review
 

 We agree with defendant that plaintiffs are confused about the proper standard governing our review. Thus, plaintiffs rely primarily on the standard for review of a trial court’s grant of a motion for new trial and only briefly mention the standard of review for JNOV. However, this appeal first involves review of the order granting JNOV. Defendant acknowledges that if we affirm the trial court’s order granting JNOV, the trial court’s order granting a new trial on the issue of damages must also be affirmed.
 

 As will appear, we shall reverse the JNOV. We shall then review the trial court’s alternative grant of a motion for new trial, under the appropriate standard of review for new trial motions.
 

 
 *1510
 
 The standard for JNOV is as follows:
 

 Code of Civil Procedure section 629 provides in part: “The court, before the expiration of its power to rule on a motion for a new trial, either of its own motion, after five days’ notice, or on motion of a party against whom a verdict has been rendered, shall render judgment in favor of the aggrieved party notwithstanding the verdict when a motion for a directed verdict for the aggrieved party should have been granted had a previous motion been made. . . .”
 

 Where appropriate a
 
 partial
 
 JNOV may be granted.
 
 (Beavers
 
 v.
 
 Allstate Ins. Co.
 
 (1990) 225 Cal.App.3d 310 [274 Cal.Rptr. 766].)
 

 “The trial court’s discretion in granting a motion for judgment notwithstanding the verdict is severely limited.”
 
 (Teitel
 
 v.
 
 First Los Angeles Bank
 
 (1991) 231 Cal.App.3d 1593, 1603 [282 Cal.Rptr. 916].) “ ‘The trial judge’s power to grant a judgment notwithstanding the verdict is identical to his power to grant a directed verdict [citations]. The trial judge cannot reweigh the evidence [citation], or judge the credibility of witnesses. [Citation.] If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied. [Citations.] “A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied.” [Citation.] ’ ”
 
 (Clemmer
 
 v.
 
 Hartford Insurance Co.
 
 (1978) 22 Cal.3d 865, 877-878 [151 Cal.Rptr. 285, 587 P.2d 1098].) The trial court cannot consider witness credibility.
 
 (Id.
 
 at p. 877.)
 

 On review of an order granting JNOV, we “ ‘must resolve any conflict in the evidence and draw all reasonable inferences therefrom in favor of the jury’s verdict. [Citation.]’ ”
 
 (Teitel
 
 v.
 
 First Los Angeles Bank, supra,
 
 231 Cal.App.3d at p. 1603.)
 

 We shall conclude reversal of the JNOV is required under this standard.
 
 [6]
 

 
 *1511
 
 II.
 
 JNOV on Comparative Fault Requires Reversal
 

 We agree with defendant that reversal is required because the trial court erroneously ordered JNOV on the issue of comparative fault by plaintiffs. Aside from multiple procedural problems with this ruling, we conclude JNOV was improper due to a conflict in the evidence.
 

 Comparative fault was not addressed in plaintiffs’ papers moving for a new trial. No party cites any oral argument in the trial court on this issue, and our review of the reporter’s transcript does not reveal any oral argument in the trial court on this issue. The jury never reached the question of comparative fault, because the special verdict form told them they need go no further if they found (as they did) that there was no design defect. The trial court never gave notice it intended to rule on this issue on its own motion. These reasons provide ample grounds for reversal.
 

 Additionally, we see merit in defendant’s argument that JNOV was inappropriate on the issue of comparative fault, because there was a conflict in the evidence concerning Mrs. Hansen’s comparative negligence. Thus, comparative fault could be found in Mrs. Hansen’s failure to detect the hole in the rubber glove she was using and her failure to investigate the cause of her finger turning gray. Although she testified she thought it was a circulation problem, she admitted she felt no snugness in the glove. Moreover, after the poison center told plaintiffs to go to the emergency room, Mrs. Hansen delayed further by taking a shower before going, even though she was in pain and needed her husband’s help to undress and dress. Additionally, the jury would not be required to accept Mrs. Hansen’s testimony that she read the label before using the product. She testified as follows;
 

 “Q. —so when you read the label that says causes severe bums which may not be immediately painful or visible, in your mind that was . . . something that would cause holes and—and create charcoaling of the skin.
 

 “A. Reddening and charcoaling of the skin and something that I didn’t relate to me.”
 

 The jury could reasonably reject this testimony as belying common sense. Although the trial court in its ruling faulted the defense for failing to prove Mrs. Hansen was untmthful, we have explained the trial court is not to weigh witness credibility in deciding whether to grant JNOV.
 

 
 *1512
 
 We conclude the trial court erred in granting JNOV on the issue of comparative negligence by plaintiffs.
 

 III.
 
 JNOV Re: Liability Was Improper
 

 As indicated, the trial court believed JNOV was proper due to insufficiency of the evidence to support a defense verdict on the liability issue—regardless of whether or not warnings could be considered in determining design defect. Defendant contends the trial court erred. We agree.
 

 We shall conclude warnings are relevant in determining design defect, and the conflict in evidence on this issue precluded JNOV.
 

 A.
 
 Warnings Are Relevant in Determining Design Defect
 

 Apparently, no California case law addresses the question whether warnings are relevant in determining whether there is a design defect under the risk/benefit test.
 

 Defendant argues the warnings on the label may be considered in determining whether Sunny Brite has a design defect under the risk/benefit test. Plaintiffs respond warnings cannot be considered, because the inquiry is whether a “design” is defective, and “design” means the liquid itself, not the label on the container. According to plaintiffs, the existence of a safer formula in this case conclusively established the existence of a design defect. We disagree with plaintiffs’ conclusion and shall conclude product warnings may be considered in determining design defect under the risk/benefit test.
 

 As we explain, the determination of design defect does not turn
 
 solely
 
 on the existence of a safer alternative design. Rather, the determination requires balancing various factors, which include feasible alternatives, but which also include other factors, such as the gravity of danger and the likelihood that the product will cause harm.
 

 “[A] product may be found defective in design, even if it satisfies ordinary consumer expectations, if through hindsight the jury determines that the product’s design embodies
 
 'excessive
 
 preventable danger,’ or, in other words, if the jury finds that the risk of danger inherent in the challenged design outweighs the benefits of such design.”
 
 (Barker
 
 v.
 
 Lull Engineering Co.
 
 (1978) 20 Cal.3d 413, 430 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1], italics added.) Thus, the test is not “preventable danger” but “excessive preventable danger.” “Excessive” preventable danger logically includes consideration of package warnings to determine the likelihood that harm will occur.
 

 
 *1513
 
 Indeed, the likelihood that harm will occur is one of the factors expressly identified as relevant to a determination of design defect under the risk/benefit test. “[I]n evaluating the adequacy of a product’s design pursuant to [the risk/benefit test], a jury may consider,
 
 among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur,
 
 the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.”
 
 [7]
 

 (Barker
 
 v.
 
 Lull Engineering Co., supra,
 
 20 Cal.3d at p. 431, italics added.) Once the plaintiff proves she suffered an injury proximately caused by the product’s design, the burden shifts to the defendant to prove, in light of the foregoing factors, that the product is not defective.
 
 (Ibid.)
 

 In our view, the “likelihood that such danger would occur” under
 
 Barker's
 
 test logically encompasses consideration of the warnings on the package. Further, consideration of package warnings are logically relevant to the ultimate inquiry of whether the design embodies “excessive” preventable danger.
 

 Plaintiffs appear to think “likelihood that such danger would occur” means the likelihood that hydrofluoric acid will cause damage if it gets on the skin and is left on the skin. They cite no authority for this construction. The bottom-line issue is whether the product is likely to cause harm. Warnings are appropriately considered in that determination.
 

 Additionally, “the issue of defective design is to be determined with respect to the product as a whole . . . .”
 
 (Daly
 
 v.
 
 General Motors Corp.
 
 (1978) 20 Cal.3d 725, 746 [144 Cal.Rptr. 380, 575 P.2d 1162].)
 
 Daly
 
 was a car accident case where the driver was thrown through the driver’s door, which had opened on impact.
 
 Daly
 
 held safety features such as an automobile safety belt and doorlock could be considered in determining whether a vehicle was defectively designed.
 
 Daly
 
 approved a jury instruction that “ ‘[i]n determining whether or not the vehicle was defective you should consider all of the equipment on the vehicle including any features intended for the safety of the driver.’ ”
 
 (Ibid.)
 
 The plaintiffs argued that only the precise malfunctioning component itself and nothing else.
 
 (Ibid.)
 
 The Supreme Court disagreed, stating:
 

 “[T]he issue of defective design is to be determined with respect to the product as a whole . . . . [<fl] The jury could properly determine whether the
 
 *1514
 
 [car’s] overall design, including safety features provided in the vehicle, made it ‘crashworthy,’ thus rendering the vehicle nondefective. Product designs do not evolve in a vacuum, but must reflect the realities of the market place, kitchen, highway, and shop. . . . Recognizing that finished products must incorporate and balance safety, utility, competitive merit, and practicality under a multitude of intended and foreseeable uses, courts have struggled to evolve realistic tests for defective design which give weight to this necessary balancing. Thus, a number of California cases have recognized the need to ‘weigh’ competing considerations in an overall product design, in order to determine whether the design was ‘defective.’ ’’
 
 (Daly
 
 v.
 
 General Motors Corp., supra,
 
 20 Cal.3d at p. 746.)
 

 Daly
 
 is not exactly on point, because the safety features at issue there were “equipment.” Nevertheless, we believe that
 
 Daly,
 
 by extension, applies to warnings.
 

 Plaintiffs appear to suggest that allowing consideration of warnings in a risk/benefit test would in effect add to the
 
 Barker
 
 test a new requirement that, in order to be defective, the product must be found to be “unreasonably dangerous”—a requirement which would conflict with California’s rejection of the “unreasonably dangerous” language in the Restatement Second of Torts. We disagree with plaintiffs’ conclusion.
 

 The Restatement Second of Torts section 402A, page 347 (hereafter § 402A) refers to liability for a product “in a defective condition unreasonably dangerous.”
 
 [8]
 
 Contrary to plaintiffs’ contention, California has not rejected section 402A in its entirety but only its “unreasonably dangerous” language.
 
 (Cronin
 
 v.
 
 J.B.E. Olson Corp.
 
 (1972) 8 Cal.3d 121 [104 Cal.Rptr. 433, 501 P.2d 1153] [rejecting “unreasonably dangerous” language];
 
 Barker
 
 v.
 
 Lull Engineering Co., supra, 20
 
 Cal.3d at p. 418 [same]; but see, e.g.,
 
 Carlin
 
 v.
 
 Superior Court
 
 (1996) 13 Cal.4th 1104, 1112-1113, fns. 2, 3 [56 Cal.Rptr.2d 162, 920 P.2d 1347] [applying other aspects of section 402A, in failure to warn context];
 
 Anderson
 
 v.
 
 Owens-Coming Fiberglas Corp.
 
 (1991) 53 Cal.3d 987, 995, 1000 [281 Cal.Rptr. 528, 810 P.2d 549] [same].)
 

 More accurately, California retains the inquiry into “dangerousness” but merely eliminates the qualifier “unreasonably.” (See
 
 Barker
 
 v.
 
 Lull Engineering Co., supra, 20
 
 Cal.3d at pp. 430-431.) Thus, with respect to design
 
 *1515
 
 defect, the formulation in this state is whether the design embodies “excessive preventable danger.”
 
 (Id.
 
 at p. 430.) Consideration of warnings is relevant to the question of excessive preventable danger and does not import a new “unreasonably dangerous” requirement into the
 
 Barker
 
 test.
 

 Cronin’s
 
 holding—that a plaintiff need only prove a defect and need not also prove the defect made the product “unreasonably dangerous”—was based on two reasons: (1) requiring a consumer to prove the “defect” caused the product to be “unreasonably dangerous” “rings of negligence;” and (2) such a requirement would permit a manufacturer to escape liability simply because of the low expectations the ordinary consumer might have for the product.
 
 (Cronin
 
 v.
 
 J.B.E. Olson Corp., supra,
 
 8 Cal.3d at p. 133; see
 
 Barker
 
 v.
 
 Lull Engineering Co., supra,
 
 20 Cal.3d at p. 425.)
 

 Neither of these reasons supports exclusion of warnings from consideration as a factor under the risk/benefit test. First, under the risk/benefit test, the burden of showing the effect of warnings in a design defect case will fall on the
 
 defendant,
 
 not the plaintiff. Thus, once a plaintiff shows a product’s design was a cause of her injury, the burden shifts to the defendant to show that the product is not “defective” because the benefits of the product outweigh its risks.
 
 (Barker
 
 v.
 
 Lull Engineering Co., supra,
 
 20 Cal.3d at p. 431.) Second, allowing consideration of warnings in a risk/benefit test does not permit the defendant to escape liability simply because of low consumer expectations. Rather, it potentially permits the defendant to escape liability because of the low likelihood of harm.
 

 Thus, we see nothing in
 
 Cronin’s
 
 rejection of the Restatement’s “unreasonably dangerous” language which supports plaintiffs’ position that warnings cannot be considered under the risk/benefit test of design defect.
 

 Plaintiffs argue that to allow consideration of product warnings in deciding the issue of design defect under the risk/benefit test would improperly shift the burden to the plaintiff, similar to the negligence standard which is to be avoided in products liability actions.
 

 However, we have explained the burden is on the defendant. Moreover, we disagree with plaintiffs’ contention that we are creating a negligence standard. Indeed,
 
 Barker
 
 itself rejected the claim that the risk/benefit test, by directing the jury to weigh a number of factors, was unacceptable because it introduced an element which “rings of negligence” into the determination of design defect.
 
 (Barker
 
 v.
 
 Lull Engineering Co., supra,
 
 20 Cal.3d at pp. 433-434.) “[P]ast design defect decisions demonstrate that, as a practical matter, in many instances it is simply impossible to eliminate the
 
 *1516
 
 balancing or weighing of competing considerations in determining whether a product is defectively, designed or not. ... fill ... PH] [A]n instruction which advises the jury that it may evaluate the adequacy of a product’s design by weighing the benefits of the challenged design against the risk of danger inherent in such design is not simply the equivalent of an instruction which requires the jury to determine whether the manufacturer was negligent in designing the product. (See, e.g., Wade,
 
 On the Nature of Strict Tort Liability for Products
 
 [(1973)] 44 Miss.L.J. 825, 835.)[
 
 9
 
 ] It is true, of course, that in many cases proof that a product is defective in design may also demonstrate that the manufacturer was negligent in choosing such a design. . . . [H]owever, in a strict liability case, as contrasted with a negligent design action, the jury’s focus is properly directed to the condition of the product itself, and not to the reasonableness of the manufacturer’s conduct. [Citations.]”
 
 (Barker
 
 v.
 
 Lull Engineering Co., supra,
 
 20 Cal.3d at pp. 433-434; see also
 
 Anderson
 
 v.
 
 Owens-Coming Fiberglas Corp., supra,
 
 53 Cal.3d at pp. 1001-1002 [strict liability has incorporated some well-settled rules from the law of negligence and has survived judicial challenges that such incorporation violates fundamental principles of strict liability].)
 

 Thus, our conclusion that warnings are relevant to the risk/benefit test does not create a negligence standard.
 

 Plaintiffs argue that to allow consideration of product warnings in deciding the issue of design defect under the risk/benefit test would violate
 
 Barker's
 
 mandate to “focus on the
 
 product,
 
 not on the
 
 manufacturer’s conduct,
 
 and that the plaintiff need not prove that the manufacturer acted unreasonably or negligently in order to prevail in such an action.”
 
 (Barker
 
 v.
 
 Lull Engineering Co., supra,
 
 20 Cal.3d at p. 418, original italics.) However, the “likelihood that the danger would cause damage” factor, to which we believe warnings are relevant,
 
 does
 
 comply with
 
 Barker’s
 
 mandate to focus on the product. The factor does not focus on the manufacturer’s conduct any more than the entire theory of “design defect” focuses on the manufacturer’s conduct in choosing the particular design.
 

 Our conclusion that a warning may weigh in the balance of design defect is consistent with but does not (contrary to plaintiffs’ contention) merge with
 
 *1517
 
 the failure to warn theory of strict liability. Thus, section 402A, comment j, page 353, concerning warnings, provides in part, “a product bearing such a warning, which is safe for use if it is followed, is not in defective condition,
 
 nor
 
 is it unreasonably dangerous.” (Italics added.) Notably, comment j does not tie warnings only to the “unreasonably dangerous” element.
 
 [10]
 

 Of course, section 402A, comment j is not directly applicable here, because it deals more directly with a failure to warn theory, rather than a design defect theory. Whereas an adequate warning will avoid liability on a failure to warn theory, it is but one factor to be weighed in the balance in a design defect case. “[U]nlike strict liability for design defects, strict liability for failure to warn does not potentially subject [defendants] to liability for flaws in their products that they have not, and could not have, discovered.”
 
 (Carlin
 
 v.
 
 Superior Court, supra,
 
 13 Cal.4th 1104, 1117 [56 Cal.Rptr.2d 162, 920 P.2d 1347].)
 

 Nevertheless, since the absence of a warning can make a product defective
 
 (Anderson
 
 v.
 
 Owens-Coming Fiberglas Corp., supra,
 
 53 Cal.3d at p. 996 [failure to warn theory]), it makes sense that the presence of a warning is an appropriate consideration in determining a product is nondefective. Otherwise, the absence of a warning would be irrelevant, since strict products liability would exist regardless of whether or not there was a warning.
 

 This does not mean that a warning automatically precludes liability. In a design defect case, the defendant retains the burden to prove the absence of a design defect under a balancing of all relevant factors.
 

 Contrary to plaintiffs’ claim, we are not merging design defect with the “failure to warn” theory of products liability (see fn. 5,
 
 ante,
 
 for failure to warn jury instructions). Certainly, there is an overlap. Thus, both theories involve inquiry into the nature and magnitude of the danger.
 
 (Barker
 
 v.
 
 Lull Engineering Co., supra,
 
 20 Cal.3d at p. 431 [factors for design defect include “gravity of the danger posed by the challenged design [and] likelihood that such danger would occur”];
 
 Anderson
 
 v.
 
 Owens-Coming Fiberglas Corp., supra,
 
 53 Cal.3d at p. 996, fn. 9 [factors for failure to warn include “nature and magnitude of the danger”].)
 

 Nevertheless, a distinction remains. Thus, “knowledge, actual or constructive, is a component of strict liability on the failure-to-wam theory.”
 
 *1518
 

 (Anderson
 
 v.
 
 Owens-Coming Fiberglas Corp., supra,
 
 53 Cal.3d at pp. 990-991, 1000.) “[U]nlike strict liability for design defects, strict liability for failure to warn does not potentially subject [defendants] to liability for flaws in their products that they have not, and could not have, discovered.”
 
 (Carlin
 
 v.
 
 Superior Court, supra,
 
 13 Cal.4th at p. 1117.)
 

 Nothing in our conclusion eradicates that distinction. A manufacturer’s placement of warnings on a product may suffice to avoid liability under a “failure to warn” theory, yet the manufacturer may still be found liable under a design defect risk/benefit analysis on the ground that,
 
 upon balancing all pertinent risk/benefit factors, including the availability of safer alternative designs (which are not at issue under a failure to warn theory),
 
 a design defect exists.
 

 In support of their argument that we are impermissibly intermingling the design defect and failure to warn theories, plaintiffs cite
 
 West
 
 v.
 
 Johnson & Johnson Products, Inc.
 
 (1985) 174 Cal.App.3d 831 [220 Cal.Rptr. 437, 59 A.L.R.4th 1], as instructive on the point that the two theories are separate and distinct. The plaintiff in
 
 West
 
 alleged she contracted toxic shock syndrome (TSS) while using tampons manufactured by the defendant. The plaintiff sought to have the jury instructed on a design defect theory only. The defendant requested jury instructions on a failure to warn theory, arguing plaintiff had criticized the manufacturer’s instructions for use of the product.
 
 [11]
 

 (Id.
 
 at p. 853.) The trial court allowed the case to be presented to the jury on a design defect theory only, a ruling which was affirmed on appeal. Plaintiffs in the case before us cite
 
 West's
 
 comment: “Even if [the defendant’s] requested instructions on failure to warn had been given in addition to the instructions on design defect, the jurors could well have found [the defendant] liable on the basis of design defect, even if they concluded that it was not liable for failing to give an adequate warning . . . .”
 
 (Id.
 
 at p. 858.)
 

 This statement in
 
 West
 
 is consistent with our analysis that a distinction between the two theories remains, and plaintiffs fail to explain how
 
 West
 
 supports their proposition that warnings cannot be considered under a risk/ benefit test for design defect.
 

 Plaintiffs also cite
 
 Cavers
 
 v.
 
 Cushman Motor Sales, Inc.
 
 (1979) 95 Cal.App.3d 338, 344 [157 Cal.Rptr. 142], for the proposition that a product
 
 *1519
 
 otherwise free of defects in design may be defective if there are inadequate warnings. Plaintiffs fail to explain how
 
 Cavers
 
 helps their case.
 

 We thus conclude allowing consideration of warnings in a risk/ benefit weighing under a design defect theory does not impermissibly intermingle that theory with the failure to warn theory of strict liability.
 

 Finally, in determining whether product warnings may be considered in a risk/benefit calculation, we are mindful of the practical consequences of our conclusion. We do not think that the risk to the consumer of the design of many household products can be rationally evaluated without considering the product’s warnings. Thus, for example, what is the risk of the design of a power saw, or other power tools or equipment, without considering the product’s directions and warnings? We dare say that the risk would be astronomically, and irrationally, high. The same could be said about common garden pesticides, or even the household microwave oven. In our view, were we to ask jurors to evaluate the risks of the design of many household products without considering their directions or warnings, the practical result would be the withdrawal from the market of many useful products that are dangerous in the abstract but safe when used as directed.
 

 We therefore conclude warnings on a product label are relevant in determining whether the product has a design defect under the risk/benefit test.
 
 [12]
 

 As indicated, the trial court granted JNOV because it concluded (1) warnings could not be considered and therefore a design defect existed, and (2) even if warnings could be considered, a design defect existed because no warning could adequately caution against the danger of the product and the warnings in this case were inadequate. Our conclusion that warnings may be considered renders the trial court’s first reason erroneous. The existence of conflicting evidence renders the court’s second reason erroneous.
 

 B.
 
 Conflicting Evidence Precludes JNOV
 

 In this case, there was conflicting evidence on the issue of design defect.
 

 Thus, the defense presented testimony of Russell Marhefka, who is a consultant in the area of product safety and warnings, and who previously worked for the National Safety Council. He said most products have some hazard or characteristic that will lead to risk on the part of the user if uninformed. He gave examples, including: Consumers are warned not to put
 
 *1520
 
 their face over a drain when using drain cleaners which could have a “geyser” effect, and consumers are warned to turn off pilot lights in the home when using acetone thinner, which is highly flammable. Marhefka stated hydrofluoric acid is used in a variety of consumer products, the Consumer Product Safety Commission has never seen fit to ban hydrofluoric acid as a component of household cleaners, and he saw no reason to ban it, based on his knowledge and evaluation of many chemical products. Mr. Marhefka said he is not a chemist and not conversant with recent California toxics law, but is knowledgeable concerning hydrofluoric acid. He expressed the opinion that (1) Sunny Brite’s label warnings cautioned specifically and appropriately regarding the precise situation that resulted in Mrs. Hansen’s injury; (2) a person of reasonably normal physical and cognitive skills would be able to use the product safely by using the information on the label; and (3) the label comported with industry custom and practice and with the Federal Hazardous Substances Act.
 

 The trial court found Mr. Marhefka’s testimony “as incomprehensible and incongruous as the warnings on the front label of the product.”
 

 However, as we have explained, the trial court cannot weigh the evidence in deciding whether to grant JNOV. Mr. Marhefka’s testimony constituted legally substantial evidence supporting defendant’s position that the danger was minimal, such that the risks did not outweigh the benefits of the product.
 

 Moreover, there was other evidence in defendant’s favor. Thus, Sunny Brite’s label warnings were consistent with standards of the Consumer Products Safety Commission.
 
 [13]
 

 Additionally, in 30 years there was only one other injury claim.
 

 As we have explained, evidence of the existence of a safer design is but one factor to be weighed in the balance and does not compel a verdict in plaintiffs’ favor. Moreover, the evidence showed the new formula took twice as long to work (30 seconds instead of 15). Although plaintiffs consider this extra 15 seconds insignificant, we believe the jury could consider the extra time an “adverse consequence” of the alternative design, under the
 
 Barker
 
 test.
 

 
 *1521
 
 Due to the conflict in the evidence, we conclude JNOV was erroneously granted on the issue of liability.
 

 IV.
 
 Motion for New Trial
 

 *
 

 Disposition
 

 The order granting JNOV on the issues of liability and comparative fault is reversed. The alternative order for a new trial is affirmed. The parties shall bear their own costs on appeal.
 

 Sparks, Acting P. J., and Davis, J., concurred.
 

 On July 18, 1997, the opinion was modified to read as printed above. Respondents’ petition for review by the Supreme Court was denied September 17, 1997.
 

 [1]
 

 Under the heading “Evidence Compelled a Finding of Defect in Design,” plaintiffs cite extensively to the testimony of doctors who treated or examined Carole Hansen’s injury, concerning their testimony about the harm that can be caused by hydrofluoric acid generally. Plaintiffs acknowledge in a footnote that the trial court precluded use of this testimony on the question whether the product was defective, in a jury instruction which stated: “[The doctors] testified as to the fact that they have treated other cases of hydrofluoric acid exposure in the past. This evidence was admitted solely for the purpose of demonstrating the doctors’ knowledge of the medical treatment of . . . hydrofluoric acid exposure and may not be considered by you on the issue of. . . whether the product in this case, ‘Sunny Brite Water Stain Remover,’ is defective.” Plaintiffs nevertheless claim this “testimony about the nature and type of injuries caused by dilute hydrofluoric acid was and is relevant to the gravity of danger element of the risk benefit test on which Defendant had the burden of proof, as well as establishing plaintiff’s injury.” However, plaintiffs’ position conflicts with the trial court’s evidentiary ruling, as reflected in the jury instruction. On appeal, plaintiffs present no legal argument challenging the trial court’s evidentiary ruling or jury instruction. We therefore disregard the doctors’ testimony.
 

 [2]
 

 Defendant notes in a footnote that it tried to cross-examine plaintiffs’ expert on the existence of such other consumer products containing hydrofluoric acid, and the trial court excluded the evidence as having more prejudicial effect than probative value. Defendant asserts this was error. We consider the contention waived by defendant’s failure properly to brief the matter under a separate heading (Cal. Rules of Court, rule 15(a)), and failure to
 
 *1504
 
 provide any legal authority
 
 (In re Marriage of Nichols
 
 (1994) 27 Cal.App.4th 661, 672-673, fn. 3 [33 Cal.Rptr.2d 13]).
 

 [3]
 

 In a footnote, defendant mentions the Federal Hazardous Substances Act (FHSA) (15 U.S.C. § 1261 et seq.), and asserts it preempts a failure to warn claim in this case. We have no need to discuss this point, because the parties on appeal dispute only the design defect theory of products liability, not failure to warn.
 

 [4]
 

 As will appear, we do not consider it necessary to decide whether warnings should be characterized as “part of the product.” Rather, we conclude that in determining whether the risks of a product design outweigh the benefits, warnings are relevant under the factors of “the gravity of the danger posed by the design, [and] the likelihood that such danger would cause damage . . . .”
 

 [5]
 

 The jury instructions on failure to warn stated: “The essential elements of a claim based upon ... an alleged defect from failure to warn are: [<]Q 1. The defendant was the supplier of a product. . . ; [1 2. The product was defective; [*I] 3. The product defect was a cause of injury to the plaintiffs; [1 4. Plaintiff’s injury resulted from a use of the product that was reasonably foreseeable by the defendant.
 

 “A product is defective if the use of the product in a manner that is reasonably foreseeable by the defendant involves a substantial danger that would not be readily recognized by the ordinary user of the product and the supplier knows or should have known of the danger, but fails to give adequate warning of such danger.
 

 “A supplier has a duty to provide an adequate warning to the user on how to use the product if a reasonably foreseeable use of the product involves a substantial danger of which the supplier either is aware or should be aware, and that would not be readily recognized by the ordinary user.
 

 “A supplier has a duty to provide an adequate warning to the consumer of a product of potential risks or side effects which may follow the foreseeable use of the product, and which are known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge at the time of the distribution.
 

 “A supplier of a product is required to foresee some degree of misuse and abuse of his product and to take reasonable precautions to minimize the harm that may result from misuse and abuse.
 

 “. . . Compliance with governmental standards or regulations does not preclude imposition of liability for a defective product. It is merely to be considered by you as some evidence on the issue of adequacy of warnings ....
 

 “. . . The law does not require [defendant] to warn against every conceivable health problem associated with the use of its product. Whether a warning is adequate depends upon several factors, among them the normal expectations of the consumer as to how a product will perform, degrees of simplicity or complication in its operation or use, the nature and magnitude of the danger to which the user is exposed, the likelihood of injury, and the feasibility and beneficial effect of including additional warnings.”
 

 [6]
 

 We therefore need not decide defendant’s contention that reversal is required by the trial court’s failure to give five days’ notice of its intention to grant JNOV on its own motion.
 

 Defendant asserts plaintiffs’ real grievance in this case is alleged misconduct by defense counsel in closing argument (by telling the jurors they could consider warnings in determining design defect)—a grievance which plaintiffs assertedly waived by failure to object in the
 
 *1511
 
 trial court. Plaintiffs respond they adequately rebutted counsel’s misstatement in their own final closing argument, and the jury instructions (according to plaintiffs) correctly precluded consideration of the warnings under the design defect theory.
 

 Closing arguments have no bearing on an order granting JNOV.
 

 [7]
 

 In this case, it appears the trial court considered the availability of an alternative design dispositive. However, the test involves a weighing of all the factors. Moreover, the trial court disregarded the evidence that the new formula took twice as long to work—a factor which we believe the jury could consider under the “adverse consequences” factor of the
 
 Barker
 
 test.
 

 [8]
 

 Section 402A, pages 347-348, provides: “(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if [U (a) the seller is engaged in the business of selling such a product, and [Ü (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. [<1 (2) The rule stated in Subsection (1) applies although [H (a) the seller has exercised all possible care in the preparation and sale of his product, and [H (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.”
 

 [9]
 

 As defendant notes, Wade expressly lists consideration of warnings or instructions as a factor relevant to the determination of whether a product is unreasonably dangerous “or is not duly safe.” (Wade,
 
 On the Nature of Strict Tort Liability for Products
 
 (1973) 44 Miss. L.J. 825, 837.)
 

 The fact that California courts have not expressly listed warnings as a separate factor in the risk/benefit test is not, in our opinion, reflective of rejection of that consideration. Rather, consideration of warnings is encompassed in
 
 Barker’s
 
 listed factors concerning gravity of the danger and likelihood that the danger will occur. Moreover, the
 
 Barker
 
 test specifically states the listed factors are not exclusive but are to be considered “among other relevant factors.”
 
 (Barker
 
 v.
 
 Lull Engineering Co., supra,
 
 20 Cal.3d at p. 431.)
 

 [10]
 

 We note other aspects of comment j have been approved in this state. (E.g.,
 
 Anderson
 
 v.
 
 Owens-Coming Fiberglas Corp., supra,
 
 53 Cal.3d at p. 1002, fn. 13 [California’s definition of constructive knowledge in failure to warn cases is derived from section 402A, comment j’s reference to knowledge obtainable by application of reasonable, developed human skill and foresight].)
 

 [11]
 

 Actually, the plaintiff’s theory was the instructions themselves were defective, because they instructed the user to keep the tampon in place until saturated, which the evidence showed was dangerous.
 
 (West
 
 v.
 
 Johnson & Johnson Products, Inc., supra,
 
 174 Cal.App.3d at p. 853.)
 

 [12]
 

 Defendant cites cases from other jurisdictions which also allow warnings to be considered. We need not consider those cases, because we find sufficient support in California law.
 

 [13]
 

 The jury was instructed: “[Y]ou have heard certain evidence that defendant ... has complied with government standards or guidelines regarding labelling its product. Compliance with governmental standards or regulations does not preclude imposition of liability for a defective product. It is merely to be considered by you as some evidence on the issue of adequacy of warnings as I will otherwise instruct you.”
 

 We believe the jury could apply this instruction to the design defect theory under the risk/benefit test as well as the “failure to warn” theory.
 

 *
 

 See footnote,
 
 ante,
 
 page 1497.